which is made "subject to all claims which the people of the state have therein." Chapter 298, p. 641, of the Laws of 1850, the authority under which this deed purports to be given, also recognizes this rule, for section 81 provides that such deeds shall vest in the grantee an estate in fee simple, subject, however, to all the claims which the people of this state may have thereon for taxes or other liens or incumbrances.

As the title of the people of the state was not lost by the proceedings under the 1852 tax sale, they had the right to transfer them by patent. Such a patent was given in 1855 to the Sacket Harbor & Saratoga Railroad Company, and by this patent title to the land passed to the patentee, unless the particular land in controversy was excepted from the grant by reason of a clause contained therein. By this clause the people excepted "such part or parts of the above-described premises as have been sold for taxes by the proper officers, and which have not been or shall not be redeemed within the time limited for that purpose by law, and the title to which shall not have been subsequently acquired by us." For several reasons this clause does not serve to nullify the grant of the land in question otherwise made by this patent. One is that the sale for taxes referred to means a legal sale made by the proper officers in the proper manner, and not a void proceeding such as was the tax sale of 1852. The plaintiff in this action claims title through the patent from the people to the Sacket Harbor & Saratoga Railroad Company; the defendant through the tax deed to Small. The defendant also claims title under a tax sale in 1900 and a deed from the comptroller to it based on this tax sale and made in 1902. This sale and deed, however, are void because of the failure of the assessors of the town of Webb to make the oath or affidavit required by statute to the assessment roll of such town for the year 1898, it being for the taxes of that year that the premises were sold on the 1900 sale. Proper findings may be prepared, and, if not agreed upon, will be settled upon due notice.

Judgment for plaintiff, with costs.

---

(41 Misc. Rep. 329.)

### W. P. DAVIS MACH. CO. v. ROBINSON et al.

(Supreme Court, Special Term, Monroe County. August, 1903.)

1. INJUNCTION—STRIKES—INTERFERENCE WITH EMPLOYÉS.
    A preliminary injunction restraining a union and its members from interfering with the business, and using threats and force inducing employés to leave the service, of the plaintiff, and preventing others from taking service with it, and keeping away customers, will not be vacated where the strike had been ordered against plaintiff not on any question of wages, but merely because it had refused to agree to employ only union men.

2. SAME—UNLAWFUL ACTS.
    While acts of persons combining to increase their wages may be lawful, such acts designed merely to injure another's business, without pecuniary advantage to the actors, may be unlawful.

¶ 1. See Injunction, vol. 27, Cent. Dig. §§ 174, 175.

Action by the W. P. Davis Machine Company against Harry Robinson and others. Motion to vacate an injunction. Denied.

Wile & Oviatt, for plaintiff.

C. E. Bostwick, for defendants.

NASH, J. This action is brought to restrain the defendant Robinson and the Rochester City Lodge, No. 93, of the International Association of Machinists, its officers, agents, members, and servants, from interfering with the business of the plaintiff. The preliminary injunction restrains the defendants from interfering in any manner with the business of the plaintiff; by threats, intimidation, force, or fraud inducing the employés of the plaintiff to leave its employment, or from inducing in any manner, by threats, intimidation, force, or fraud, men seeking employment with the plaintiff from entering such employment with the plaintiff; congregating about the factory of the plaintiff, located on Mill street, in the city of Rochester, N. Y., in crowds, at any time, and interfering with any employé of the plaintiff, or any person having business at the plaintiff's factory; congregating at any place in the city of Rochester and calling any of the plaintiff's employés, or men endeavoring to seek employment with plaintiff, "scabs," or from calling plaintiff's factory a "scab factory" or "scab shop"; and other acts of a nature injurious to the plaintiff's business, particularly enumerated.

The allegations of the complaint, supported by affidavits, upon which the preliminary injunction was granted, are to the effect: That in March last the defendant union, through its executive committee and its business agent, presented to the plaintiff for signature a contract which, among other things, provided that the plaintiff would be permitted to employ only machinists in good standing with the International Association of Machinists, and that no piecework or premium system—a system which was in vogue in the plaintiff's factory—should be allowed. The plaintiff refused to sign the proposed contract, and on the 11th day of April the defendant union ordered a strike, and ordered all members of its lodge, No. 93, who were in the employment of the plaintiff, to leave its factory in a body, and in obedience to such order the members of the defendant union on that day quit the plaintiff's employment. That at that time the plaintiff had in its employ over 100 men, some 60 of whom were members of the defendant union. That the greater portion of the other employés of the plaintiff, who were not members of the union, left with the strikers. That the plaintiff thereafter, with such men as could be secured from Rochester and other places, and such of its employés as remained, has since attempted to continue its business. That, immediately after the strike was on, pickets were stationed by the defendant union at the plaintiff's factory, and members of the defendant union, numbering from 25 to 40, congregated in front of the plaintiff's factory evenings, as its employés were leaving their work, and at such times hooted and yelled at such employés, calling them "scabs," and otherwise taunting, abusing, and threatening them; that at such times the members of the union and other strikers were joined by large crowds of outsiders and sympathizers, who joined the strikers in hooting,

yelling at, insulting, taunting, and threatening the men who remained or took employment with the plaintiff after the strike. That employés of the plaintiff have been intimidated, threatened, and coerced by members of the defendant union into leaving the plaintiff's employment, and have been followed from the plaintiff's factory and assaulted and beaten by members of the defendant union. That its members have called upon the plaintiff's customers and told them that injury would result to them, through the efforts of defendant union, if they traded or had any business dealing with the plaintiff.

The defendants now move, upon very voluminous affidavits of members of the defendant union and others, to vacate the injunction. It is claimed that in these affidavits all the equities set up in the plaintiff's complaint are explicitly denied, and that therefore the temporary injunction should be vacated; invoking the rule that, where the material averments of the plaintiff's bill are met by a full and explicit denial in the answer, a preliminary injunction will be dissolved. This rule has no application in cases where the defendants do not assert any right to do the acts complained of. Davis v. Zimmerman, 91 Hun, 489, 36 N. Y. Supp. 303. The affidavits here as to the commission of the alleged acts of violence and unlawful interference with the plaintiff's business are conflicting, and therefore the application to vacate the injunction must upon that ground be denied.

I am of the opinion that the application should not be denied upon that ground alone. The defendants concede that, prior to the granting of the injunction, members of the union were stationed in and about the plaintiff's factory morning, noon, and night, when men employed by the plaintiff were going and coming from their work, for the purpose of persuading, and that they did persuade and endeavor to get, the persons employed by the plaintiff, who had taken the places of the strikers, to leave the employment of the plaintiff. And it is insisted upon this motion that defendants have that right, and that they may, by advice and persuasion, induce the plaintiff's employés to leave the employment of the plaintiff—in other words, deprive the plaintiff of the means of carrying on its business unless it accedes to the demands of the defendant. There is no question of wages involved in the strike. The plaintiff was paying its employés full union wages. The strike was ordered because the plaintiff refused to sign an agreement that it would not employ any but members of the union, and refused to discard the premium system in its factory.

It has not yet been held by the courts of our state, and I am not prepared to hold, that a business carried on in a lawful way may be so interfered with, merely because its owner refuses the dictation of a labor union as to the method in which the business shall be conducted or carried on. What means, when assembled and cooperating together, persons employed in any calling, trade, or handicraft may adopt for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate, under the provisions of the Penal Code, have not been fully defined. In one respect it has been found necessary to modify the provisions of the Code as to the right impliedly given. An amendment has been en-

acted which provides that a person who, either by himself or with another, obstructs or annoys a member of the National Guard, or his employer, in respect of his trade, business, or employment, because said member of said National Guard is such member, is guilty of a misdemeanor.

In the case of Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, it is held that:

"The organization or co-operation of workingmen is not of itself against any public policy, and must be regarded as having the sanction of law, when it is for such legitimate purpose as that of obtaining an advance in the rate of wages or compensation, or of maintaining such rate."

The court, in rendering its decision there, said:

"In the general consideration of the subject, it must be premised that the organization or the co-operation of workingmen is not against any public policy. Indeed, it must be regarded as having the sanction of law, when it is for such legitimate purposes as that of obtaining an advance in the rate of wages or compensation, or of maintaining such rate. Pen. Code, § 170. It is proper and praiseworthy, and perhaps falls within that general view of human society, which perceives an underlying law that men should unite to achieve that which each by himself cannot achieve, or can achieve less readily. But the social principle which justifies such organization is departed from when they are so extended in their operation as either to intend or to accomplish injury to others. Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper or to restrict that freedom, and, through contracts or arrangements with employers, to coerce other workingmen to become members of the organization, and to come under its rules and conditions, under the penalty of the loss of their position and of deprivation of employment, then that purpose seems clearly unlawful, and militates against the spirit of our government and the nature of our institutions."

In the course of its opinion the court cited with approval the case of Regina v. Rowlands, 17 Ad. & El. (N. S.) 671, where the Court of Queens' Bench, upon a motion for a new trial for misdirection of the jury by Mr. Justice Earle, below, approved of his charge, in which he instructed the jury that:

"A combination for the purpose of injuring another is a combination of a different nature, directed personally against the party to be injured, and the law allowing them to combine * * * gives no sanction to combinations which have for their immediate purpose the hurt of another. The rights of workingmen are conceded, but the exercise of free will and freedom of action, within the limits of the law, is also secured equally to the masters. The intention of the law is, at present, to allow either of them to follow the dictates of their own will with respect to their own actions and their own property; and either, I believe, has the right to study to promote his own advantage, or to combine with others to promote their mutual advantage."

The distinction is plain. The acts of persons combining and confederating for the purpose of increasing their wages may be lawful, while combinations and acts which have for their objects and purpose injury merely to the business of another, without any pecuniary advantage to the persons so combining, may be unlawful. The English case is in point. There the question involved was of the right by combination to prevent certain workingmen from working for their employers, and thereby to compel the latter to make an

alteration in the mode of conducting their business—precisely the question here; the object of the defendant being to compel the plaintiff to change its method of business in such a manner as will conform to the requirements of the defendant union, not in the matter of wages. It seems that the common-law right of action for enticing away from the master a servant has not been taken away, unless possibly for the purpose of obtaining an advance in or maintaining the rate of wages; hence, when the rights of the master are unlawfully interfered with, and there is not an adequate remedy at law, equity will take jurisdiction by injunction. Motion to vacate the injunction denied, with $10 costs.

Motion denied, with $10 costs.